Kurt C. Rommel (*Pro Hac Vice*)
E-Mail:      krommel@milesstockbridge.com
James T. Carmichael (State Bar No. 131497)
E-Mail:      jcarmichael@milesstockbridge.com
**MILES & STOCKBRIDGE P.C.**
1751 Pinnacle Drive, Suite 500
McLean, Virginia 22102-3833
Telephone:   (703) 903-9000
Facsimile:   (703) 610-8686

Fredrick A. Rafeedie (State Bar No. 138422)
E-Mail:      farafeedie@jonesbell.com
Michael J. Abbott (State Bar No. 53042)
E-Mail:      mjabbott@jonesbell.com
William M. Turner (State Bar No. 199526)
E-Mail:      wmturner@jonesbell.com
**JONES, BELL, ABBOTT, FLEMING & FITZGERALD L.L.P.**
601 South Figueroa Street, Twenty-Seventh Floor
Los Angeles, California 90017-5759
Telephone:   (213) 485-1555
Facsimile:   (213) 689-1004

Attorneys for Defendants Doug Mockett & Company, Inc.,
Doug Mockett and Inland Plastics, Inc.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| ROGER PLUMLEY<br><br>            Plaintiff,<br><br>      v.<br><br>DOUG MOCKETT & COMPANY INC., *et al.*<br><br>            Defendants, | **CASE NO.  CV 04-02868-GHK (Ex)**<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THE GROUNDS OF LACHES AND EQUITABLE ESTOPPEL**<br><br>Hearing Date:   May 12, 2008<br>Time:           9:30 A.M,<br>Judge:          Judge George H. King<br>Courtroom:      Roybal 650 |

///

///

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ....................................... 1

    A. DMC's Grommet Business and Its Former Dealings with Plumley ........... 3
    B. Plumley's Knowledge of DMC's Sales of the Allegedly Infringing
       Product .............................................................................. 3
    C. Economic Prejudice to the Defendants due to Plumley's Delay ................. 6
    D. Evidentiary Prejudice Caused by Plumley's Delay ..................................... 8

STANDARD FOR SUMMARY JUDGMENT ................................................. 9

ARGUMENT ................................................................................... 10

I. Plumley's Claims Are Limited by the Doctrine of Laches ................................ 10

    A. Laches is Presumed when there is a Delay Greater Than
       Six Years ............................................................................ 10
    B. The Elements of Laches and the Effect of the
       *Aukerman* Presumption .......................................................... 10
    C. The *Aukerman* Presumption Applies in this Case ..................................... 11

II. Plumley's Entire Lawsuit is Barred by Equitable Estoppel .............................. 12

    A. Plumley Refused to Say that He Would Ever Sue ..................................... 12
    B. Defendants Reasonably Relied on Plumley's
       Decade of Silence ................................................................. 14
    C. Defendants Would Suffer Economic and Evidentiary
       Prejudice if this Lawsuit Were Allowed to Proceed ............................... 15

CONCLUSION ................................................................................. 16

# TABLE OF AUTHORITIES

## CASES                                                                                      Page

*ABB Robotics Inc. v. GMFanuc Robotics Corp.,*
    52 F.3d 1061 (Fed. Cir. 1995) ….…..……………….……………..10, 12, 14

*A.C. Aukerman Co. v. R.I. Chaides Construction Co.,*
    960 F.2d 1020, 1030, 1034-35 (Fed. Cir. 1992) …..…………………….10, 11, 12

*Bernardy v. Powell,*
    2005 WL 267135288 (W.D.Wash 2005)……………….........................15

*Hall v. Aqua Queen Mfg., Inc.,*
    93 F.3d 1548, 1552-53 (Fed. Cir. 1996)….……………………………9, 11

*Hunt v. Cromartie,*
    526 U.S. 541, 552 (1999)………….…………………........................9

*Miller v. Glenn Miller Productions, Inc.,*
    318 F. Supp. 2d 923, 932 (C.D. Cal. 2004), *aff'd,*
    454 F.3d 975 (9th Cir. 2006) …………….……………….........…….……….9

*Mycogen Plant Science, Inc., v. Monstanto Co.,*
    161 F.3d 681, 685 (Fed. Cir. 1998)...…………….……………….................14

*Scholle Corp. v. Blackhawk Molding Co., Inc.,*
    133 F.3d 1469 (Fed. Cir. 1998)….……….……………….10, 12, 13, 14

*Wanlass v. General Electric Co.,*
    148 F.3d 1334 (Fed.Cir. 1998)…………………………..………….9, 11

## STATUTES

35 U.S.C. § 146…………………………….…………………..2, 5, 15
35 U.S.C. § 286………….…………………………….………..….13

## RULE(S)

Fed. R. Civ. P. 56(c)… ………………………….………………9

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND DISMISSAL ON THE GROUNDS OF LACHES AND EQUITABLE ESTOPPEL

## **INTRODUCTION**

Defendants, Douglas Alfred James Mockett ("Mockett"), Doug Mockett & Company, Inc. ("DMC") and Inland Plastics Inc. ("Inland Plastics") (collectively "Defendants") submit this Memorandum of Points and Authorities in Support of their Motion for Summary Judgment.  The undisputed material facts of this case establish that the Plaintiff Roger Plumley ("Plumley") delayed nearly ten (10) years before bringing his claims of patent infringement against the Defendants.  During that time, Defendants even asked whether they would ever be sued for infringement, and Plaintiff refused to say that he would do so.  That prejudicial delay and misleading silence bars all or part of Plaintiff's claims by virtue of the doctrines of laches and equitable estoppel.

## **STATEMENT OF UNDISPUTED MATERIAL FACTS**

On April 23, 2004, Plumley filed this action against the Defendants, alleging infringement of U.S. Patent No. 5,167,047 ("the '047 Patent") for a wire management grommet.[1]  The invention described in Plumley's '047 Patent is a grommet – a wire management device that surrounds a hole in a desktop through which wires pass.  A cap on a grommet may contain a tab, which may be closed to cover the hole or opened to let the wire pass through.  Plumley's '047 Patent describes a grommet with a pivoting tab that pivots down to open.  (Ex. 1, Fig. 5.)

The issue of whether Plumley is the true inventor of a grommet featuring a downwardly pivoting tab has been disputed since the early 1990's and has been the subject of prior federal and state litigation. While the merits of that dispute are immaterial to the instant motion, certain evidence adduced in those prior proceedings reveal (i) Plumley's knowledge of the Defendants' allegedly infringing activity as far back as at least July 1994 and (ii) Plumley's failure to timely assert his claims of

---

[1]   A copy of the '047 Patent is marked as Exhibit 1.  All exhibits referenced in this memorandum are in Exhibits To Defendants' Memorandum In Support Of Defendants' Motion For Summary Judgment filed separately.

1   infringement.

2          Many of the undisputed material facts supporting this Motion were

3   developed in the following litigation between the parties:

4          ●      A patent interference before the United States Patent and Trademark Office

5   ("PTO") captioned *Mockett v. Plumley*, No. 103,260 (U.S. PTO) (filed 7/28/93) (the

6   "Interference").[2]

7          ●      An action in this Court by Plumley seeking review of the PTO's decision

8   in favor of Mockett pursuant to 35 U.S.C. § 146, captioned *Plumley v. Mockett,* CV 98-

9   6117-GHK (Ex) (C.D. Cal.) (filed 7/29/98) (the "Section 146 Action").[3]

10         ●      A civil action by DMC against Plumley in California state court alleging,

11  *inter alia*, unfair competition and misappropriation of trade secrets, captioned *Doug*

12  *Mockett & Co. v. Plumley,* Case No. BC 094386 (filed 12/3/93) (the "State Unfair

13  Competition Action").[4]

14         ●      A first malicious prosecution action by Plumley against Mockett in

15  California state court captioned *Plumley v. Mockett,* Case No. BC 189 247 (Sup. Ct. for

16  County of Los Angeles) (filed 4/13/98) (the "State Malicious Prosecution Action").

17         ●      Reexamination proceedings before the PTO concerning the '047 Patent,

18

19

20  2   The initial decision of the PTO's Board of Patent Appeals and Interferences (the
21      "Board") in favor of Mockett in the Interference dated September 30, 1996, is
        marked as Exhibit 2. A copy of the Board's decision denying Plumley's Motion for
22      Reconsideration, dated June 29, 1998, is marked as Exhibit 3.

23  3   A copy of this Court's initial opinion, dated December 9, 1998, in the Section 146
        Action is marked as Exhibit 4. A subsequent opinion by this Court in the Section
24      146 Action, dated June 4, 1999, is marked as Exhibit 5. This Court's final judgment
        in favor of Plumley in the Section 146 Action was subsequently affirmed on appeal.
25      *See Plumley v. Mockett,* 153 Fed. Appx. 737, 2005 WL 2850969 (Fed. Cir. 2005).

26  4   The state trial judge's Findings of Fact in the State Unfair Competition Action are
        marked as Exhibit 6. Marked as Exhibit 7 is the Court of Appeals' unpublished
27      opinion affirming the decision of the lower court in the State Unfair Competition
        Action. *See Doug Mockett & Company Inc. v. Plumley et al.,* B098541, B101969
28      (Cal. App 2d. Dist.).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT ON THE GROUNDS OF LACHES AND EQUITABLE ESTOPPEL

1   (the "Reexamination").[5]

2   **A.    DMC's Grommet Business and Its Former Dealings with Plumley**

3           DMC has been in the business of marketing and selling plastic grommets

4   since 1980.   From 1983 to 1989, DMC contracted with Defendant Inland Plastics to

5   manufacture its plastic grommets.  (Ex. 7 at p. 2.)   Around mid-1989, DMC contracted

6   with another plastics manufacturer, Jet Plastics, Inc. ("Jet Plastics") for such work.  (*Id.*)

7   At the time, plaintiff Plumley served as Jet Plastics' sales representative for DMC and

8   was responsible for manufacturing grommets according to DMC's designs.  (*Id.*)

9           This relationship between DMC and Jet Plastics lasted until January 1991.

10  (*Id.*)   As explained below, after termination of its brief relationship with Jet Plastics,

11  DMC resumed doing business with Inland Plastics.

12          On October 1, 1991, Plumley filed his application for the '047 Patent.  The

13  PTO issued the '047 Patent on December 1, 1992.  (Ex. 1 at p. 1.)

14  **B.    Plumley's Knowledge of DMC's Sales of the Allegedly Infringing Product**

15          Due to the parties' business dealings and the litigation that has occurred

16  since, Plumley has long been aware of DMC's sales of grommets that he now alleges

17  infringe the '047 Patent.

18          As explained in the Declaration of Jean Rowe (DMC's bookkeeper),[6]

19  DMC has sold many different types of grommets over the years.  (Ex. 9, Rowe Decl.,

20  ¶ 5.)   One such line of grommets is marketed by DMC under the tradename Flip-Top™.

21  (*Id.*)   DMC's Flip-Top™ grommets are plastic grommets that feature a downwardly

22  pivoting tab.  (*Id.*)[7]

---

5   Plumley filed the instant action on April 23, 2004, while Reexamination was
    pending. Subsequently, this action was stayed until completion of the Reexamination
    proceedings.   Recently, on August 15, 2007, the PTO issued a decision in the
    Reexamination (marked as Exhibit 8).  In light of this ruling, this Court has lifted the
    previous stay of this action, thereby allowing Mockett to file this Motion.

6   The Declaration of Jean Rowe, DMC's bookkeeper, is marked as Exhibit 9.

7   Photographs of DMC's line of Flip-Top™ grommets as depicted in DMC's current
    product catalog are collectively attached as Exhibit A to Ms. Rowe's Declaration.

DMC began selling a grommet with a downwardly pivoting tab (later named Flip-Top™) in 1992,[8] and continues to sell them today. (Ex. 9, Rowe Decl., ¶ 6.) Over the years, DMC has expanded its line of Flip-Top™ grommets to include grommets of different shapes and sizes – all of which feature a downwardly pivoting tab. (*Id.*) DMC's sales efforts for its Flip-Top™ grommet, of course, are no secret. Over the years, DMC has heavily promoted and advertised its Flip-Top™ grommets at trade shows, in trade magazines, in product catalogs and on the Internet. (*Id.*, ¶ 7.) For example, as early as 1994, DMC's Flip-Top™ grommets appeared in DMC's company catalog. (*Id.*, ¶ 7 & exhibit B thereto.) Since 1994, DMC has advertised its Flip-Top™ grommets in popular trade magazines, such as *Furniture Design & Manufacturing* magazine. (*Id.*, ¶ 7 & exhibit C(1) thereto.)

Plumley has been on notice of DMC's sale of these grommets since at least July 1994. On July 14, 1994, DMC's current President, Susan Gordon, submitted a Declaration in the Interference,[9] in which she testified that DMC began selling a grommet with a pivoting tab in 1992. (Exh. 10(A), Gordon Decl., ¶ 16). This Declaration was served on Plumley's attorney in July 1994 and Plumley was thus on notice of DMC's Flip-Top™ grommets at least by that time.

On February 8, 1995, Mr. Plumley testified at his deposition that he knew of DMC's sale of grommets with downwardly pivoting tabs. (Ex. 10(B).)[10] Specifically, while looking at a picture of the cap from one of DMC's Flip-Top™

---

While Plumley's vague allegations of infringement in his Complaint do not identify DMC's Flip-Top™ grommet line by name, the Flip-Top™ grommets are the products sold by the Defendants that feature downwardly pivoting tabs. It was a sample of a Flip-Top™ grommet that Plumley's attorney showed to the Court at the Scheduling Conference in this case and which his attorneys identified at that time as being the infringing product.

8    Ex. 10(A), Gordon Declaration in the Inteference, ¶ 16.

9    Exhibit 10(A).

10   Excerpts from Mr. Plumley's testimony in the Interference on February 8, 1995 are marked as Exhibit 10(B).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THE GROUNDS OF LACHES AND EQUITABLE ESTOPPEL

grommets, Plumley testified as follows:

> Q.  Do you recognize this as a grommet cap that Mockett and Company [DMC] is presently selling . . . I'm asking him if he knows that this is a grommet cap that Mockett and Company is presently selling.
>
> R.  I know that Mr. Mockett is selling a grommet that has a tab of this design.  I didn't know that he was making this size.

(Exh. 10(B), Plumley Dep. at p. 217, l. 12 – p. 218, l. 1).

On June 6, 1995,[11] Plumley's counsel showed Mockett excerpts from DMC's 1994 price list and product catalog offering the Flip-Top™ grommet for sale. In response to that questioning, Mockett confirmed DMC's sales of its Flip-Top™ grommets.  (Ex. 10(C), 6/6/95 Mockett Dep. at p. 248, l. 11 – p. 249, l. 19.)

In 1998, Plumley sued Mockett in this same Court over this same patent, seeking judicial review of the ruling against Plumley in the Interference, pursuant to 35 U.S.C. § 146.  Although Plumley could have brought any infringement claims in that § 146 action, he chose not to do so.  In his Reply in Support of his Renewed Motion to Lift Stay filed in October 2007, Plumley admitted that he made a conscious decision not to bring his infringement claims earlier:

> Plumley hoped to clear the administrative issues of the interference before moving forward with an infringement suit or even to resolve the economic issue of the infringement through the interference proceeding, thereby obviating the need for an infringement action altogether.

Defendants should not be prejudiced by Plumley's decisions regarding litigation strategy.

Despite his undisputed knowledge of the allegedly infringing activity, Plumley waited from at least July 14, 1994 until April 23, 2004 (hereinafter, the

---

[11] Excerpts from the June 6, 1995 Deposition of Mockett during the Interference are marked as Exhibit 10(C).

1   "Laches Period") to file the patent infringement claims he raises in this case.  At no
2   time during the Laches Period did Plumley provide notice of his intent to sue
3   Defendants for patent infringement.  (Ex. 11, Olsen Decl., ¶ 18.)   Indeed, when
4   specifically asked if he intended to sue for infringement, Plumley refused to answer.[12]

5   **C.     Economic Prejudice to the Defendants due to Plumley's Delay**

6           During Plumley's delay, DMC and Inland Plastics invested heavily in the
7   manufacture, distribution and promotion of Flip-Top™ grommets.

8           DMC conservatively estimates it invested more than $1.85 million in
9   expanding its Flip-Top™ grommet business during the Laches Period.  (Ex. 9, Rowe
10  Decl., ¶ 13.)   As explained in Ms. Rowe's Declaration, this total estimated figure
11  includes: (1) more than $1.5 million in advertising and marketing its line of Flip-Top™
12  grommets (*Id.*, ¶ 8, exhibit D thereto); (2) more than $125,000 in additional tooling to
13  expand production of Flip-Top™ grommets (*Id.*, ¶ 11, exhibit E thereto); and (3) an
14  estimated $225,100 in renovating and leasing more warehouse space dedicated to the
15  Flip-Top™ grommets (*Id.*, ¶ 12, exhibit F thereto).

16          For many years, DMC has contracted with Defendant Inland Plastics – a
17  manufacturer of injection-molded plastics – to manufacture all of its Flip-Top™
18  grommets.  (Ex. 9, Rowe Decl., ¶ 9.)   As explained by Inland Plastics' President,
19  William Olsen,[13] Inland Plastics invested heavily in increased production capacity and
20  manufacturing equipment to meet the growing production needs of DMC during the
21  Laches Period.  (Ex. 11, Olsen Decl., ¶ 8.)  A significant percentage of that investment
22  was made to support DMC's Flip-Top™ product line, including, *inter alia*:

23          (1)     Master Unit Die (MUD) Bases (or frames) necessary to hold new molds and
24                  MUD inserts for the Flip-Top™ line (*Id.*, ¶ 11);

25          (2)     Two 300-ton injection molding machines and related support equipment to

26

27  12  Excerpts from the transcript of Plumley's deposition taken on September 29, 2000 in
        the State Malicious Prosecution Action are marked as Exhibit 12.

28  13  The Declaration of Inland Plastics' President, William Olsen, is marked as
        Exhibit 11.

1   accommodate new high capacity production molds for certain of the Flip-

2   Top™ grommets (*Id.*, ¶ 12);

3   (3)   Three additional hopper loaders used to feed raw materials into the new 300-

4   ton injection molding machines (*Id.*);

5   (4)   Additional auxiliary granulators used to grind parts and plastic runners from

6   production units (*Id.*, ¶ 13); and

7   (5)   An additional auxiliary canister set used to dry raw materials for production.

8   (*Id.*)

9   During the Laches Period, Inland Plastics also moved into a new

10   manufacturing facility that was approximately two and one-half times larger than its

11   previous facility.  (*Id.*, ¶ 14).  The move into a larger facility was necessitated, in part, by

12   Inland Plastics' need to accommodate DMC's then growing capacity demands, including

13   its expanding Flip-Top™ grommet line.   (*Id.*)   The increased rent, taxes and utilities

14   almost tripled the amount Inland Plastics had been paying at its previous facility.

15   Until Inland Plastics became aware of the Complaint in this case in May

16   2004, it believed that Plumley would never sue for any claim relating to the manufacture

17   of DMC's Flip-Top™ product line.  (Ex. 11, Olsen Decl., ¶ 16).  This belief was based at

18   least upon the passage of time, the existence of other litigation between Plumley and

19   DMC that did not include any claims for infringement, and the fact that, despite Inland

20   Plastics' contact with Plumley and his attorneys in connection with the other litigation,

21   there was never any discussion of any claimed infringement nor any threat of an

22   infringement action. (*Id.*)

23   During the Laches Period, Inland Plastics became aware of the other

24   litigation that had been filed by both Plumley and DMC relating to DMC's Flip-Top™

25   grommets.  Inland Plastics believed that if there was going to be any litigation relating to

26   the manufacture of DMC's Flip-Top™ product line, it would have been brought at the

27   same time as those other actions.  (*Id.* ¶17)  In addition, the President of Inland Plastics

28   was called to testify as a witness in connection with one of those matters and, as a result,

1 | had interactions with Plumley through his attorney.  At no time during those interactions,
2 | did Plumley or his attorney ever suggest that they had a claim of any description against
3 | Inland Plastics.  (*Id*.)  There was no indication at all that Plumley ever intended to sue for
4 | patent infringement (*Id*.)

**D.    Evidentiary Prejudice Caused by Plumley's Delay**

Plumley's decade-long delay in asserting his claims of patent infringement also has severely compromised the Defendants' ability to defend the infringement claims.

At least three witnesses with respect to the issue of patent invalidity and unenforceability have died and are thus unavailable due to Plumley's delay.  Lloyd Johnson, the former Chief Executive Officer of Jet Plastics, is deceased.  During his deposition in the State Unfair Competition Action,[14] Plumley identified Mr. Johnson as one of the persons to whom Plumley showed a hand-built model of the invention described in the '047 Patent – a model that Plumley contends reduced his invention to practice.  (Ex. 13, Plumley Dep. at p. 116, ll. 10-15.)  Furthermore, as the former CEO of Plumley's employer, Mr. Johnson could have testified to Plumley's knowledge of Mockett's prior designs, which designs are material to the patentability of Plumley's claims.

Plumley also allegedly showed his hand-built model to his parents who are likewise now also unfortunately deceased.  (Ex. 13, Plumley Dep. at p. 116, ll. 10-15.)[15]

In addition to these unfortunate deaths, the usual adverse evidentiary effects of lengthy delays are also present here.  As explained by William Olsen, certain

---

14 Excerpts from Plumley's Deposition in the State Unfair Competition Action taken March 11, 1994 are collectively marked as Exhibit 13.

15 Bernard Cournoyer, co-inventor of prior art U.S. Patent No. 4,520,976 is also now deceased.  Mr. Cournoyer provided affidavits in Reexamination No. 90/008,355 regarding the state of the prior art of grommet design and could have been expected to testify to those issues here, as well as to the knowledge possessed by those skilled in that art.  (Copies of Mr. Cournoyer's Affidavits dated July 6, October 2 and October 10, 2006 in the Re-examination are marked as Exhibits 14(A), 14(B) and 14(C)).

1  key production managers involved in Inland Plastics' manufacture of Flip-Top™

2  grommets during the Laches Period have since left Inland Plastics.  (Ex. 11, ¶ 20.)  The

3  absence of key witnesses, coupled with the sheer passage of time, will likely hinder the

4  defense of the infringement claims. (*Id.*)

## STANDARD FOR SUMMARY JUDGMENT

6          Federal Rule of Civil Procedure 56(c) provides for summary judgment

7  when the "there is no genuine issue as to any material fact and that the moving party is

8  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(C).  "The moving party

9  bears the initial burden of demonstrating the absence of 'a genuine issue of material fact

10  for trial."  *Miller v. Glenn Miller Productions, Inc.*, 318 F. Supp. 2d 923, 932 (C.D. Cal.

11  2004), *aff'd,* 454 F.3d 975 (9th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477

12  U.S. 242, 256 (1988)).

13          "The burden then shifts to the nonmoving party to establish, beyond the

14  pleadings, that there is a genuine issue for trial."  *Id.*  (citing *Celotex Corp. v. Catrett*,

15  477 U.S. 317, 324 (1986).  While the non-moving party's evidence "is to be believed

16  and all justifiable inferences are to be drawn in [that party's] favor,"[16] the non-moving

17  party "must come forward with more than 'the mere existence of a scintilla of

18  evidence.'"  *Miller*, 318 F. Supp. 2d at 932 (quoting *Anderson*, 477 U.S. at 252).  Thus,

19  "'where the record taken as a whole could not lead a rational trier of fact to find for the

20  nonmoving party, there is no genuine issue for trial.'"  *Id.* (quoting *Matsushita Elec.*

21  *Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

22          In applying this standard in patent infringement cases, numerous federal

23  courts, including this one, have granted defendants' motions for summary judgment on

24  the grounds of laches and equitable estoppel.  *See, e.g.*, *Hall v. Aqua Queen Mfg., Inc.,*

25  93 F.3d 1548, 1552-53 (Fed. Cir. 1996) (affirming this Court's grant of summary

26  judgment based on laches for seven out of eight patent infringement defendants);

27  *Wanlass v. General Electric Co.*, 148 F.3d 1334 (Fed. Cir. 1998) (affirming summary

28

---

16  *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT ON THE GROUNDS OF LACHES AND EQUITABLE ESTOPPEL

1  judgment on the ground of laches); *Scholle Corp. v. Blackhawk Molding Co., Inc.,* 133
2  F.3d 1469 (Fed. Cir. 1998) (affirming this Court's grant of summary judgment on the
3  ground of equitable estoppel); *ABB Robotics Inc. v. GMFanuc Robotics Corp.,* 52 F.3d
4  1062 (Fed. Cir. 1995) (affirming summary judgment on the ground of equitable
5  estoppel).

## **ARGUMENT**

7          Based on the foregoing undisputed facts, Plumley's suit is barred by the
8  doctrines of laches and equitable estoppel.  Under the doctrine of laches, a delay of
9  more than six years in asserting a claim of patent infringement gives rise to a
10 presumption of laches that precludes a plaintiff from recovering for any pre-suit acts of
11 infringement.  Similarly, the doctrine of equitable estoppel bars the entire claim,
12 including recovery for continuing acts of infringement during the pendency of the suit
13 when, as here, the plaintiff's misleading refusal to assert his infringement claims in a
14 timely manner has prejudiced the defendants.

15 **I.     Plumley's Claims Are Limited by the Doctrine of Laches**

16      **A.     Laches is Presumed When There is a Delay Greater Than Six Years**

17          Federal courts uniformly recognize a rebuttable presumption of laches
18 when a plaintiff delays filing a patent infringement suit six years beyond the date he
19 knew or should have known of the allegedly infringing activity.  *A.C. Aukerman Co. v.*
20 *R.I. Chaides Construction Co.,* 960 F.2d 1020, 1034-35 (Fed. Cir. 1992) (citations
21 omitted).  Laches bars recovery of damages for all infringement that occurred prior to
22 the filing date of the lawsuit.  *Id.* at 1041.

23      **B.     The Elements of Laches and the Effect of the *Aukerman* Presumption**

24          "Two elements underlie the defense of laches: (a) the patentee's delay in
25 bringing suit was unreasonable and inexcusable, and (b) the alleged infringer suffered
26 material prejudice attributable to the delay."  *Aukerman,* 960 F.2d at 1028.  Normally,
27 the accused infringer bears the burdens of production and persuasion for both of these
28 elements.  *Id*.  But where the presumption of laches arises as a result of a delay of six

1    years or more, the burden of production to show a lack of unreasonable delay or

2    prejudice shifts to the patentee.  *Hall,* 93 F.3d at 1553 (citing *Aukerman,* 960 F.2d at

3    1037-38).  "[W]here the patentee fails to meet this burden of production by coming

4    forward with *either* affirmative evidence of a lack of prejudice *or* a legally cognizable

5    excuse for its delay in filing suit, the two facts of unreasonable delay and prejudice

6    '*must* be inferred.'"  *Hall,* 93 F.3d at 1554 (emphasis in original) (quoting *Aukerman*,

7    960 F.2d at 1037).  Unless the presumption is overcome, the alleged infringer may

8    remain "*utterly mute*" as to both elements, and will still succeed in his defense.  *Id.*

9    (emphasis in original).

10        **C.    The *Aukerman* Presumption Applies in this Case**

11            For purposes of laches, "[t]he period of delay begins at the time the

12    patentee has actual or constructive knowledge of the defendant's potentially infringing

13    activities." *Wanlass*, 148 F.3d at 1337-38 [citations omitted].  Plumley filed this suit on

14    April 23, 2004.  Thus, whether or not the *Aukerman* presumption applies depends on

15    whether Plumley actually knew, or constructively should have known, of the allegedly

16    infringing activity more than six years prior to that date.  As explained above, the

17    undisputed material facts and Plumley's admissions clearly show that he did.

18            In July 1994, Mockett served on Plumley a Declaration of Susan Gordon in

19    which she stated that DMC had been selling a grommet with a pivoting tab since 1992.

20    (Ex. 10(A), ¶ 16.)  Shortly thereafter, Plumley acknowledged he knew about such sales

21    (Ex. 10(B), 2/18/1995 Plumley Dep. at p. 217, l. 12 – p. 218, l. 1.)  (Ex. 10(D), 6/30/95

22    Plumley Trial Testimony at p. 967, l. 24 – p. 968, l. 14.)  Thus, at least as early as July

23    1994 (and probably earlier), Plumley had knowledge of the Defendants' alleged

24    infringement.

25            Therefore, Mockett is "entitled to the benefit of a presumption of

26    unreasonable delay and prejudice, the two critical factual predicates for the application

27    of the equitable bar of laches." *Hall*, 93 F.3d at 1552 (citing *Aukerman,* 960 F.2d at

28    1032-41).  The burden now shifts to Plumley to show why his claim for pre-suit

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT ON THE GROUNDS OF LACHES AND EQUITABLE ESTOPPEL

1   damages is not barred by laches.

2   **II.   Plumley's Entire Lawsuit is Barred by Equitable Estoppel**

3   While the doctrine of laches bars recovery for all pre-suit acts of

4   infringement, the doctrine of equitable estoppel bars Plumley's entire claim. *Scholle*

5   *Corp. v. Blackhawk Molding Co., Inc.,* 133 F.3d at 1471 ("Equitable estoppel . . . may

6   serve as an absolute bar to a patentee's claim of infringement.") (citing *Aukerman,* 960

7   F.2d at 1041). The elements of equitable estoppel are:

8       a.   The patentee, through misleading conduct, leads the alleged infringer to

9           reasonably infer that the patentee does not intend to enforce its patent

10           against the alleged infringer.  'Conduct' may include specific statements,

11           action, inaction, or silence where there was an obligation to speak;

12       b.   The alleged infringer relies on that conduct; and

13       c.   Due to its reliance, the alleged infringer will be materially prejudiced if

14           patentee is allowed to proceed with its claim.

15   *Id.*; *see also*, *ABB Robotics Corp.,* 52 F.3d at 1063. Here, all three elements are met.

16       **A.   Plumley Refused to Say that He Would Ever Sue**

17   The defense of equitable estoppel may be based on "silence" or "inaction."

18   *Scholle*, 133 F.3d at 1472; *ABB Robotics Corp*., 52 F.3d at 1064.  While "silence alone

19   will not create an estoppel," silence will support the defense when there "was a clear

20   duty to speak, or somehow the patentee's continued silence reinforces the defendant's

21   inference from the plaintiff's known acquiescence that the defendant will be

22   unmolested." *Aukerman*, 960 F.2d at 1043-44.

23   In his September 29, 2000 deposition, Plumley admitted he had never

24   threatened Mockett with a patent infringement suit and refused to say that he would

25   **ever** sue:[17]

26         "You can answer the question, Mr. Plumley, as to

27         whether you personally told Mr. Mockett that you intend to sue

28   _____

17  Exhibit 12 at 152.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT ON THE GROUNDS OF LACHES AND EQUITABLE ESTOPPEL

him for patent infringement.

THE WITNESS:  No.

Q     BY MR. MOSCARINO:  Do you intend to sue him for patent infringement?

MR. MARTIN:  Same objections.  Instruction not to answer.  It's not relevant.  It's not reasonably calculated.  It's work product.  It's attorney-client privilege."

Plumley's September 29, 2000, refusal to threaten suit was remarkable in that it took place after approximately eight years of supposed infringement had already elapsed, the presumption of laches under *Aukerman* had taken effect, and damages were being cut off daily by the six-year limitation of 35 U.S.C. § 286.  Because Plumley had not yet sued and was not even threatening to sue as his claim was being statutorily curtailed, the natural conclusion was that he never would.

Even without such a direct refusal to assert a patent, this Court has granted summary judgment in similar circumstances.  In *Scholle*, the owner of a patent (Scholle) for a water bottle cap (the '354 patent) sued its competitor (Blackhawk) alleging that Blackhawk's SAFEGARD™ bottle cap infringed the '354 patent. *Scholle,* 133 F.3d at 1470.   For three years prior to filing suit, Scholle was aware of Blackhawk's SAFEGARD™ cap, Blackhawk's rival patent for the product, and "Blackhawk's rapidly increasing sales of SAFEGARD™ caps." *Id.*  Despite this knowledge, Scholle delayed for three (3) years before filing suit against Blackhawk for infringement of the '354 patent in this Court. *Id.* at 1471.

In affirming this Court's decision to grant summary judgment in favor of Blackhawk, the Federal Circuit held, "[W]hen the course of dealings between a patentee and an alleged infringer is such that the alleged infringer reasonably infers from the patentee's misleading conduct or inaction that the patentee has waived its patent rights, then the first element of equitable estoppel has been established absent a statement to

the contrary by the patentee." *Id.* at 1472.

The rationale in *Scholle* applies with even greater force in this case.  Here, as in *Scholle,* Plumley had actual knowledge of the Defendants' alleged infringement.  In addition, Plumley had actual knowledge of Mockett's rival patent application, and DMC's rapidly increasing sales of FlipTop™ grommets.  Nevertheless, Plumley waited not just three, but almost ten years before pursuing his claims of patent infringement.  At no point during this decade of delay did Plumley provide notice to Defendants of his intention to file such an infringement suit.  (Ex. 11, Olsen Decl., ¶ 13.)  Indeed, in his deposition in the State Unfair Competition Action, Plumley refused to answer the direct question of whether he intended to sue for patent infringement.  (Ex. 12.)  Plumley's refusal to speak at his deposition, coupled with his decade-long acquiescence to the alleged infringement, clearly compelled the conclusion that Plumley had no intention of pursuing any claims of supposed patent infringement.  Thus, as in *Scholle,* the first element of equitable estoppel is met.

## B.   Defendants Reasonably Relied on Plumley's Decade of Silence

In reliance upon Plumley's misleading silence and inaction, the Defendants were prejudicially "lulled . . . into a sense of security that [they] would not be sued." *ABB Robotics Corp., supra*, 52 F.3d at 1064.   During Plumley's ten-year delay, Defendants not only continued their manufacturing and marketing of the allegedly infringing Flip-Top™ grommets, but made significant capital expenditures to expand those operations (Ex. 9, Rowe Decl., ¶¶ 8, 11 & 12); (Ex. 14, Olsen Decl., ¶¶ 11-15). As recognized by the Federal Circuit, the undisputed fact of the Defendants' capital investments during the decade of delay establishes the reliance element of equitable estoppel.  *See, Aukerman,* 960 F.2d at 1042-43 (expanded production (*e.g.*, building a new plant) can support the reliance element of equitable estoppel).

Any reliance by Plumley upon the earlier Interference action and the related Section 146 Action is misplaced.  "Federal district courts,… have long heard infringement cases when a patent-at-issue is involved in an interference." *Mycogen*

– 14 –

1  *Plant Science, Inc., v. Monstanto Co.,* 161 F.3d 681, 685 (Fed. Cir. 1998).  Moreover,

2  patent infringement claims are commonly joined as additional counts to a Complaint

3  seeking judicial review of an adverse PTO interference ruling pursuant to 35 U.S.C.

4  § 146. *See, e.g., Bernardy v. Powell,* 2005 W.L. 2671352 (W.D. Wash. 2005).  Plumley

5  could easily have joined his patent infringement claims to the Section 146 Action that

6  he filed in this Court on July 29, 1998.  Instead, he waited until April 23, 2004 to make

7  those claims.

8      **C.    Defendants Would Suffer Economic and Evidentiary Prejudice if this**

9          **Lawsuit Were Allowed to Proceed**

10      During Plumley's ten years of misleading silence and refusal to assert the

11  patent, Defendants spent millions of dollars to expand production.  Important witnesses

12  died.  This is precisely the type of prejudice justifying dismissal: "As with laches, the

13  prejudice may be a change of economic position or loss of evidence." *Aukerman*, 960

14  F.2d at 1043.  Defendants clearly have suffered economic and evidentiary prejudice in

15  this case.

16      As to economic prejudice, the undisputed material facts show that the

17  Defendants invested heavily in the manufacture, distribution and promotion of Flip-

18  Top™ grommets during Plumley's ten-year delay.   DMC invested more than

19  $1.85 million in expanding its Flip-Top™ grommet business during that time.  (Ex. 9,

20  Rowe Decl., ¶¶ 8-13.)  Inland Plastics made similar investments in increased production

21  capacity and manufacturing equipment to meet DMC's growing production needs for

22  Flip-Top™ grommets during the Laches Period. (Ex. 11, Olsen Decl., ¶¶ 9 – 14.)

23      As to evidentiary prejudice, Plumley's ten-year delay in bringing this suit

24  severely compromises the Defendants' ability to defend this case.  "Evidentiary or

25  'defense' prejudice, may arise by reason of a defendant's inability to present a full and

26  fair defense on the merits due to the loss of records, the death of a witness, or the

27  unreliability of memories of long past events, thereby undermining the court's ability to

28  judge the facts." *Aukerman*, 960 F.2d at 1033 (citations omitted).  Here, all of these

factors are present.   Important witnesses died during Plumley's ten-year delay, including Lloyd Johnson and Plumley's parents.  These witnesses could have provided testimony critical to the issue of patent invalidity and/or unenforceability.  Also, the departure of certain key production managers, coupled with the sheer passage of time, will likely hinder the defense.  (Ex. 11, Olsen Decl. ¶ 20.)  The undisputed facts of this case provide even more evidentiary support for equitable estoppel than that found sufficient in other cases to support summary judgment.

For the foregoing reasons, this lawsuit should be dismissed with prejudice on the ground of equitable estoppel.

## CONCLUSION

**WHEREFORE,** Defendants respectfully request that this Court enter summary judgment in their favor based on the defenses of laches and equitable estoppel, and dismiss the case with prejudice and as such other and further relief as the court deems proper.

Dated:  March 31, 2008

Kurt C. Rommel (*Pro Hac Vice*)
James T. Carmichael
**MILES & STOCKBRIDGE P.C.**

Michael J. Abbott
Fredrick A. Rafeedie
**JONES, BELL, ABBOTT,**
    **FLEMING & FITZGERALD L.L.P.**

By:___/s/ Kurt C. Rommel_____
      **KURT C. ROMMEL**
Attorneys for Defendants Doug Mockett & Company, Inc., Doug Mockett and Inland Plastics, Inc.